(August 10, 1995)

■ In the Matter of 45TH STREET BLOCK ASSOCIATION et al., Respondents, v RUDOLPH GIULIANI, as Mayor of the City of New York, et al., Appellants. [630 NYS2d 526] —Judgment, Supreme Court, New York County (Charles Ramos, J.), entered February 8, 1995, which granted petitioners' application pursuant to CPLR article 78 to permanently enjoin respondents-appellants from taking any further action with respect to a Request for Proposals issued by the New York City Department of Homeless Services for the renovation, development and operation of a specialized transitional housing facility to be located at 215-255 East 45th Street in Manhattan, and ordered them to rescind the Request for Proposals, unanimously reversed, on the law, the injunction vacated, the petition denied and the proceeding dismissed, without costs.

Pursuant to section 6.3 of the Fair Share Criteria of the City Planning Commission,* a Community Advisory Committee ("CAC") was established by the Department of City Planning and Community Board No. 6 to monitor a proposed women's shelter to be established at 215-225 East 45th Street in Manhattan. The site, a former convent, had already been acquired by respondents and survived a challenge to its acquisition pursuant to Fair Share Criteria relating to concentrations of facilities in the neighborhood.

Petitioners, who are or represent certain businesses and residents in the area and only one of whom has served as a member of the CAC, claim that respondents should be enjoined from proceeding with the project because, in planning the facility, they failed to comply with section 6.3 of the Fair Share Criteria by not adequately consulting with the CAC established to monitor the facility. Contrary to the IAS Court, we find that respondents substantially complied with section 6.3 and that the petition should be dismissed.

Petitioners first point to the fact that the final meeting of the CAC took place in June 1993, which was close to a year prior to the issuance of a Request for Proposals ("RFP") in May 1994 to elicit bids from not-for-profit organizations for the development and operation of the facility. They argue that the passage of almost a year from the final consultation with the community and the issuance of the RFP was so long as to be in itself a violation of the criterion. However, respondents have offered satisfactory explanations for the delay, including the CAC's own agreement not to meet until after the RFP was filed, the change in administrations and the moving of offices.

Moreover, the only rationale offered by petitioners as to why further meetings of the CAC were necessary to keep the community informed is the fact that the RFP made the presence in the shelter of a 30-bed Transitional Living Facility ("TLC") for mentally ill women contingent upon funding and indicated that if such funding were not available, the entire shelter, which will comprise 130 beds, would be devoted to a program for alcohol and substance abusers. Petitioners point to the fact that, at the time the CAC had met, the presence of the TLC in

---

* Section 6.3 states, in pertinent part: "Upon the request of the Borough President and/or Community Board, a sponsoring agency and Community Board shall establish a facility monitoring committee, or designate an existing community Board committee, to monitor a facility following the selection and approval of its site. The agency shall inform the committee of plans and procedures that may affect the compatibility of the facility with the surrounding community."

addition to and along with a substance abuse program had been assumed and had been a crucial factor, since there was strong community feeling that there was a need for mental health services that would give preference to treatment of mentally ill homeless women in the neighborhood. However, the record reveals that there had been full opportunity for airing of the various viewpoints as to the inclusion of the TLC in the project at the time the CAC had met and it is difficult to imagine what new information could have been offered at additional meetings on the subject. Under these circumstances, the fact that the TLC was later listed as contingent upon funding was not such a drastic change in the proposal as to require new meetings of the CAC. Petitioners' attempts to imply that the CAC had some sort of veto power over the project that was undermined by respondents is meritless. There is no basis to find, as contended by petitioners, that the role of the CAC was expanded by either City Planning Commission Resolution 234-250 or City Council Resolution 1452, so as to render respondents' actions in violation of those resolutions. Nor do we find that the RFP's failure to make the TLC a mandatory component violated those resolutions, neither of which specifically required the TLC, although they do require the presence of intensive "social service and/or mental health" programs. In addition, the letter agreement between then Deputy Mayor Cesar Perales, Borough President Ruth Messinger and Community Board No. 6 is not enforceable by petitioners, nor does it indicate the existence of any legislative intent to bestow upon the CAC the power to make the project's future contingent upon its approval. Concur—Murphy, P. J., Ellerin, Wallach, Rubin and Tom, JJ.